I'm John Wadnola, appearing this morning on behalf of the Intervenor Defendants of the Washington Beer and Wine Wholesaler Association. With me at council table is my colleague, Andrea McNeely. She will not be presenting argument, but she was instrumental in the briefing, and I thought it would be nice to have her join us if she's agreeable with the panel. That's fine. Also at council table is Martha Lance, Assistant Attorney General, who will be presenting argument for the state, and her colleague, David Hankins. Very well. How will you allocate your time? Ms. Lance and I would like to divide the direct time, reserve six minutes for rebuttal, and divide the remaining direct time roughly equal to 12 minutes apiece. Very well. You're going to have to watch your own time now, counsel. Very well, Your Honor. I'm going to address the unilateral restraint issue, focusing principally on the failure of the trial court to properly analyze that issue and also to properly give separate consideration to the various laws. I will touch on some of the First Amendment issues. Ms. Lance will address the State Action Immunity and the 21st Amendment issues from the perspective of the state. Very well. I'd like to start by emphasizing that the trial court got it right on the retailer-to-retailer salesman. That is a law that precludes businesses from engaging in a particular activity which would otherwise be available to them and would otherwise be lawful. It limits competition, but it does not facilitate the exchange of price information or any other kind of information. It does not create a non-market mechanism that enforces private marketing decisions. With respect to that law, there is no decision being enforced. It doesn't give anyone private regulatory power. It doesn't do anything in the form of collusive or concerted activity. It's clearly a unilateral restraint. It's not subject to preemption. That's as far as the analysis needs to go. With the possible exception of the price posting, and I will come back to that, that same analysis applies to every other law being challenged. The ban on credit, for example, says that people who ordinarily could offer credit and do so perfectly lawfully cannot do so in dealing with beer and wine. There is, again, no exchange of private information. Excuse me. No exchange of price information. Well, putting aside the warehouse issue of the ones that she found were non-unilateral, the rest of them all have something to do with the pricing and are interconnected in some way with the post and hold issue. I don't believe they are, Your Honor. The price posting is a mechanism whereby people make their prices or post their prices with the government, and after they become effective, they are public information. And they're held for 30 days. And so my understanding is that the delivery issues and the credit issues and the other ones are, but no group discounts, are all, you know, one could view them as necessary to enforce the post and hold. I don't know if that's the answer to the question, but they're at least interrelated, are they not? They are interrelated in the way they function, but the relationship goes the other way, I believe. The relationship is that the overriding principle, if you look at the statute, is roughly uniform pricing. So the pricing of the post and hold was really put in place later and for the purpose of enforcing the other things rather than in that direction. Right. And this can be seen by considering the impact of the laws if you take the price posting away. If there were no price posting, you would still be able to have and should have the ban on volume discounts, the ban on credit. All of those make sense independently. They don't lose any of their significance in terms of uniform pricing and the state's ability to regulate. Without price posting, what they lose is, what the state loses is a little bit of ability to enforce it. So I submit that what the trial court should have done. Well, without the hold, you keep talking about the posting, but it's a posting and a hold. And without the hold, I mean, some of the rest seems to just kind of evaporate, because if you have you don't have a hold and you have a prohibition on group discounts or a requirement of uniformity, you just change the price every five minutes, and then you can't ever prove up that there's been a group discount. You just say, well, you know, I charged, you know, my price five minutes ago was this, but now it's that. Exactly. The hold is an essential element of the enforcement process. Without the hold, it's not impossible to enforce, but it becomes much more difficult to enforce. You have to start approving intent. You have a lot of issues that aren't there otherwise. But what the trial court's fundamental error in this area was failure to give proper deference to legislative intent. There are clear federal jurisprudence that says you're going to invalidate a state statute. You need to do so in a way that does the least damage possible to the legislative purpose. In this case, you have specific legislative enactments by the State of Washington as part of this provision saying that the clauses should be severed. Under those circumstances, the appropriate analysis is to first look at whether or not the laws as a whole could be characterized as hybrid or unilateral. I think under a proper reading of Miller, the laws as a whole are unilateral and valid. But even if you assume that Miller ---- Let me just be sure I understand what you're saying. You're saying we should not go item by item? I think the first thing you do ---- To look at all of the price-related restrictions as a whole? I think the first thing you have to do is look at the ---- look at it as a whole and say, is it hybrid or unilateral? And I believe, looked at as a whole, I think you'd conclude it's unilateral. Yes, but when you start to look at some of these specific provisions, they're per se violations of the Sherman Act, are they not? I don't believe they are. There are other reasons why that may or may not prohibit the State from doing it. But on the surface ---- I don't believe they are with the possible exception of price posting. Under the Miller analysis, price posting and the hold in that case was a ---- was condemned because the statute compelled activity that was the equivalent of a price fixing arrangement. It facilitated an exchange of price information. The other laws, if you take price posting aside, the other laws have none of that effect. If the law is simply ---- Well, they may, in fact, have that effect. I mean, they have more of an effect, actually, because they're absolute and they're not simply exchanges, but they're a prohibition on credit and a prohibition on discounts and so on. But as I understand your argument, it's that, nonetheless, because there's no discretion, they're unilateral. Exactly. There is no private discretion. There's no private decision-making. There's no private regulatory power. Imagine, for example, two States with identical credit laws. One has a price posting system, the other doesn't. To me, it makes no sense to say that the one is valid where there's no price posting and invalid where there is price posting. But that seems to be the analysis. When you take price posting ---- Did Judge Peckman ever, aside from the global view, look at the individual other ---- She did not. And, in fact, she specifically declined to. She relied on a case involving a private antitrust conspiracy, treated the State statutory system as though it were the equivalent of a private antitrust conspiracy, and ruled on that basis that the laws had to be thrown out as a whole. I submit, again, that that's the tail wagging the dog. The State has commanded that you do or not do certain things. It has given no discretion, given no private regulatory power. It has simply said you cannot, if you are, excuse me, if you are dealing with retailers, you cannot charge credit. There is no private decision-making being enforced by that law. Other than, perhaps, you could say the decision to comply with the law or not. And as a practical matter, since there's a response to whatever we hold in the legislature, presumably, I mean, if we were to strike down the post and hold and not everything else, or if we were to strike down, that would be one view. And the other is if we strike down everything, you just go back to the legislature and say, well, enact everything without the post and hold. So it doesn't make a whole lot of difference. I mean, it makes a difference in the fact that you need legislative action. But the probable net result is going to be about the same, no? It could be, provided that the direction from this Court is — Well, instead of guessing about what the legislature would want, maybe we ought to just find out by saying, well, we're looking at this as a package. If you want a piece of it, go and do it. Well, I don't think that's an appropriate description. The State has already determined by having the severability clause that the legislature has already said we want these provisions in there. The legislature has declined to amend the law since Judge Beckman initially ruled. I think it's — I think the province of this Court, to assume that the legislature intended any of the provisions that aren't constitutionally infirmed to remain in effect, it's — it would be extraordinarily difficult. In fact, Ms. Lance intends to renew, and I will join in her renewing the request for an indefinite State. It puts the State in an extraordinarily difficult position to try to guess as to what the limits on the authority are. If this — if the ruling of this Court were clear that everything is being thrown out only because post and hold is invalid and that anything else can be reenacted, it seems to me that's — I mean, it's somewhat curious. You're correct. In fact, the Court — the legislature could reenact it. On the other hand, if you say that the post and hold is invalid and everything else is valid, the legislature would then be in a position to remove any provisions that they chose not to. Our point is not that the — that these laws are right or wrong. Our point is that these laws are within the province of the legislature, not the Federal courts. All right. So what about the post and hold independently, to begin with? I mean, are you conceding that, given Miller, you don't have too much left to stand on at this point? I don't think that the — I don't think that the reading of Miller that's urged on this Court by Ocosco and by the trial court is correct, because I think it does a disservice to Fisher and Rice and the concerted activity requirement. I went to considerable length in the briefing to explain that, and I'm happy to discuss it here. But I think this Court should take the opportunity to clarify the reach of Miller. To me, it makes no sense to say you have to have concerted activity in order to have a per se violation. There's no concerted activity here, but there's a per se violation, simply because the statute — But the problem is that the 324 case in the Supreme Court kind of does that, too. But the 324 case — Is that really the source of the problem more than Miller? No, because the 324 case on its own terms is dealing with resale price maintenance, what has been always described as a pernicious form of concerted activity. That is exactly what was happening in Midcow and in Schwegman and in 324 Licker. They all deal with a form of concerted activity that we don't have here. How do you distinguish — now, how do you distinguish Miller from this case? Is that sort of the advanced peak? I'm sorry, is that sort of what, Your Honor? The advanced look you get in Miller? It is. In Miller, you — That's not the — but that's not the only thing that, you know, that the Miller Court depended on, is it? Miller may be — may very well be read to say that any price-posting system that allows an exchange of information is invalid. If that is the ruling, if that is what it means, then the Washington law is invalid. I believe that that ruling doesn't make sense in light of Fisher and Rice, which have the express direction from the Supreme Court that there should be a concerted activity. We're bound by Miller. Well, Fisher is a completely different case because Fisher just, you know, was — I mean, it was set by the City Council. Period. Period. Fisher is a completely different case on its facts. Yeah, so how can you say Fisher some way, you know, should change Miller? Because both Rice and Fisher, in both cases, the holding is that there is — that concerted activity is an essential element of a per se violation. Remember, this all goes back to Rice. It says before there can be preemption, you have to have — the State has to mandate or permit activity, conduct that would be a per se violation in all cases. Fisher says to have a per se violation in all cases, you have to have concerted activity. So if you read Miller the way the trial court did, Miller says you have to have concerted activity, there isn't any here, but there's a per se violation anyway. And you're reading the concerted activity in the 324 Liquor Corp. case as being basically the sales agreement between the wholesaler and the retailer because they're not actually agreeing to the retail price supports. That's being mandated. And, in fact, the amount of it is being mandated. So the only — the only possible agreement is simply I'm going to sell you some liquor. But it's not agreement. It's concerted activity. Okay. So the retail price maintenance is one person dictating the prices another person is going to sell for. There you have the — But what I'm saying is, in fact, there, the wholesaler wasn't dictating anything. The State was dictating it. What the wholesaler was doing was agreeing to sell it to them. So there was that much of an agreement, but — No. The distributor in that case could set its bottle price at any level it chose to. Right. And that forced the retailer to charge a retail price, 112 percent of the bottle price. Yeah. Obviously, that's what I'm saying. They were obviously going to charge something. So, therefore, the only possible agreement is I'm going to sell you X at Y price. And then the State regulation kicked in and said what the retailer had to sell it. But in 324 Liquor, it wasn't saying I'm going to sell you at X price. I have already sold to you at the case price. You've already bought it. You may have bought it a month ago or a year ago at a case price. Today, I'm going to post the bottle price. You're not buying from me at the bottle price. I'm going to post the bottle price. And when you sell today, you have to be 112 percent of my bottle price, even though it may have nothing to do with your cost or my cost. Right. But that's being dictated by the government. The 112 percent is dictated by the government. Right. The bottle price is determined independently by the distributor. Counsel, you've used about 15 minutes. It's up to you to allocate your time. I appreciate you answering questions, but I don't want to encroach on my colleague's time. So if I would turn the podium over to her. Very well. Thank you. Good morning. May it please the Court, my name is Martha Lance. I'm an Assistant Attorney General for the State of Washington. Before I begin my argument, I would like to renew the State's motion for an indefinite stay from this Court, as was invited by the November 30, 2006, order of this Court. The District Court imposed a stay which expires May 1st. For the reasons set forth in the stay briefing filed last fall before this Court, a new stay from this Court is necessary. A stay past May 1st gives this Court time to analyze the case without undoing 70 years of existing regulatory structure in the meantime. Counsel, we will take your motion under advisement. Thank you. The trial court decision in this case impacts Washington and a majority of States with similar liquor laws. That is why 30 States and jurisdictions filed or joined briefs in support of Washington's three-tier system for beer and wine sales and distribution. Now, Washington doesn't really have a three-tier system anymore. This is one thing I'm having a real problem with. As I understand it, Washington now permits essentially eliminated the second tier. No one has to have a second tier, right? That's not correct, Your Honor. What Washington allows is direct sales from producers to retailers and to bypass a distributor. However, when the producer elects to take that role, it is bound by all of the existing regulations that govern distributors. So essentially, they sit in the distributor's chair. So all of the controls and the ordering of the market and the stability and the uniform prices that's achieved by the regulatory structure continue to exist, regardless of the legislature's most recent decision to allow direct sales from producers and out of Washington to Washington's day retailers. So the three-tier system remains intact, the goals and the elements of it. As Mr. Guanola stated, the trial court should be reversed on any of the grounds that are before this Court, which are the antitrust analysis, state action immunity, or the 21st Amendment. And I will address the state action immunity. Well, so suppose we're not persuaded on those issues. Where does Parker fit in? Parker v. Brown addresses the state action immunity doctrine, which is an alternative mechanism for upholding the regulations, even if this Court does determine that there is an antitrust violation. And the doctrine of Parker v. Brown was before the district court on summary judgment. The district court erroneously denied summary judgment to the state on those grounds as all of the elements were met. Well, the problem I have with your Parker argument is that I'm not persuaded yet that there is active supervision by the state. That's one of the requirements. I mean, on one end of the spectrum, you could have total, for example, public utility regulation, where the state occupies the entire regulatory field and maintains a regular supervisory function over all activities. How is that true here? Well, what you have here, I think, that I want to make the initial distinction that's important is similar to Mr. Guanola's distinction, that the regulatory elements consist of a number of directives to achieve price uniformity. And those are then enforced by the price posting and the price holding. And the elements that achieve market stability are the same. But it's being enforced, so to speak, by the distributors and retailers themselves, not by the state, is it? The state enforces all of the elements that require the price uniformity. Those are self-executing conditions of licensure in Washington. Let's talk first about the post and hold, which is very similar to the Miller situation. In Miller, there was no active supervision because the manufacturer was free to telegraph any price they wanted to, right? It's true here, isn't it? It's not true here. Well, what's the supervision here? The difference between the price posting system in Oregon and the one that is in place in Washington now is, as you stated earlier, the advanced look or the ahead-of-time opportunity. But Miller didn't seem to care much about that. It was mentioned sort of in passing, and it was mentioned kind of in passing in TRW, but it didn't seem to be resting on that. In this Court's analysis of the state action immunity doctrine in the Miller case, the Court used the terms that state regulation doesn't save what is otherwise an impermissible pricing scheme. And in my opinion, that's the key that this Court recognized in the Miller case, that because of the opportunity to view each other's prices ahead of time, it became akin to pricing. I have real trouble understanding how these two pieces fit together, the preemption analysis and the state action analysis. It seems to me they're just going over the same ground twice. But if, since the Supreme Court in our case has seemed to do it twice, if you do that in other words, if you've gone through the thread of the needle with regard to the preemption analysis, let's assume, in Miller and here, and now we're at the state action, Parker v. Brown, at that point, it seems to me that the distinction that you're seeing with Miller really becomes inoperative. And so if it didn't matter at the preemption level, I don't see how it can matter at the Parker v. Brown level. That's what I'm saying. Well, I think it does matter. The distinguishing characteristic of Miller is that when it invalidated the posting system in Oregon, it did so because the State of Oregon did not engage in individualized price review, which is the exact reason why the district court invalidated Boston. And that's true here, too. Pardon me? That part. In other words, what I'm saying is if the distinction with the advanced look doesn't matter at the preemption level, I don't see how it can matter at the preemption level. Well, I think it does matter at both levels. But why does it matter at the second level, the level that you're arguing now? Because if there's no impermissible price-setting opportunity, if the system doesn't allow the actors to get together and collude or anything approaching collusion in setting their price, then the obligation of the State to supervise by individualized price review doesn't exist. Its obligation is to simply enforce the State laws. And that's what this Court found in the Snake River cases following the precedent from the Supreme Court in the Tycor in the Patrick v. Burgett case, that when the laws themselves do not delegate regulatory decision-making power to private actors But then you're assuming the opposite answer at the preemption level, right? It'd have to be. I'm asking, is there any way that this could not fail at the preemption level, could, you know, survive, fail at the preemption level, but still be, you know, be, come within the State immunity doctrine? Yes. The State action immunity doctrine holds that even if a regulatory system does violate the Sherman Act in the antitrust analysis, that it can be saved by the State action immunity doctrine. I want to see how on these facts that could be. That's what I'm trying to understand. On these facts, it can be and it is because with respect to, setting aside for a moment the Post and Hull, because I understand that's troubling, but with respect to all of the other obligations and bans, those are self-executing regulatory directives. No, I understand. I thought we were talking Post and Hull. Let's talk about Post and Hull. No, no. And I'd like to make the distinction that with respect to the State supervision of everything but the Post and Hull, that it's the State's position that it falls under the Snake River and Tycor analysis, that they're self-executing regulatory directives. But that's for exactly the same reason that you say that they're unilateral. And it seems to me that's why I don't see why there are two theories here. Right. Because it's exactly the same reason. But as to the Post and Hull. As to the Post and Hull, I think that the distinction between Washington's Post and Hull and the system invalidated under the Miller case is, does turn on the ability to have an advanced look. And interestingly, when the case that was decided by this Court in Miller went back to the trial court for its 21st Amendment analysis, that trial court found that, in fact, the actors were using the system. The system was available to allow them to get together and collude and agree and signal on prices before they became final. That's not possible in Washington. There's no evidence in this record that anything like that can or does happen. And I think that's a crucial distinction. Counsel, may I suggest you get to the 21st Amendment issue? Yes. You want to reserve some time, I know. Turning to the 21st Amendment issue, which this Court need not reach if it decides the case on the other grounds, but assuming that you want to get there, the district court erred as a matter of law on that issue when it gave the limited Federal interest in liquor competition greater constitutional significance than Washington State's substantiated 21st Amendment interest. Washington State proved at the trial that its regulations implicate and serve its 21st Amendment core concerns of orderly markets, temperance in the sense of controlled, responsible overall consumption, and it serves the interest, State's interest of revenue generation. I guess what bothers me is the issue of how much the State has to show in terms of the effectiveness of the scheme in achieving those goals. That is the question. I mean, what is the burden and what do you have to show? The North Dakota case from the Supreme Court holds that so long as the State substantiates its interest, establishes that its interests are real and not pretextual, and has some efficacy towards achieving the 21st Amendment goals, that the burden would then shift to the challenger to show that there was either no relationship whatsoever to any 21st Amendment core concerns or that the regulations as enacted by and carried out by the State totally failed to serve 21st Amendment concerns. And that's not the case here. The district court found that, had the opinion that Washington State could have accomplished its 21st Amendment goals in other ways. Excise tax, for example. Correct. Correct. But that's not the 21st Amendment test. Counsel, the most recent expression on the 21st Amendment is Granholm, the interstate wine case. Which way does that point in terms of your approach to the 21st Amendment? Well, the Granholm case did, in fact, include the language from the North Dakota case that said a State's three-tiered system for ordering its markets is unquestionably legitimate. And the Granholm case really doesn't apply here because that's a Commerce Clause, a Dormant Commerce Clause analysis, where the Supreme Court in that case held that the Dormant Commerce Clause, if it's violated, that the 21st Amendment will never work. I can't read these cases for the tea leaves to tell us what they're really saying about 21st Amendment. Well, it's the State's position that Granholm certainly doesn't control the outcome of this case. And you can look at it another way, too, that any intrusion into Federal interests in this case are minimal and are limited. There is no Federal right to unfettered competition for alcohol versus the Dormant Commerce Clause violation that we have all learned in law school is one of the most serious violations. I'd like to reserve the remainder of our time. Roberts. You may do so, counsel. Thank you. We'll hear from Costco. May it please the Court, David Drummond for Costco. I would like to make a few points in overview and then turn to some of the questions that were asked in the argument before. And I will try not to re-argue Miller and Granholm and all of the other cases, but talk about what their logic and their language says. Washington has imposed admitted restraints on competition. Their briefs admit that. They admitted that at the trial court, both in the pretrial order and in the evidence. And they are constraints that facilitate private distributors in raising prices to retailers above competitive value. All right. Well, how is that? I mean, again, leaving aside the Postman-Holm, it appears that the other restraints why aren't the other restraints unilateral restraints if we separate them out? If I could first question the premise about separating them out. Well, we'll get to that. But what about separating them out? Okay. I'll start on the other. Okay. You have a situation in which our expert testified as to each of them individually and as to the package that they had or each of them had a tendency to facilitate interdependent pricing separately. They did not rebut that. In fact, their expert agreed on a number of them that it had that possibility. They claimed that prices were artificially inflated above competitive levels, and the only way that could happen is if, in fact, there was this interdependent pricing. Now, they ---- Well, for example, when you say you can't have group discounts, so somebody sets a price and you can't have a group discount, well, obviously it's going to be higher the prices are going to be higher than the group discount would be, but there's nothing that the private party has to do except not charge group discounts. And it's very hard to answer these questions without getting back to the interlocking nature that they argued. But let me first address that one, for example. That is also a facilitating practice. Anytime you simplify what the parties need to look at in terms of interdependent pricing, if you require uniformity, if you eliminate quantity discounts, if you require delivered pricing, you are making interdependent pricing more likely. And that is exactly what this Court and the Supreme Court in 324 and the Fourth Amendment do. They have a private part of it, the key part of setting the ultimate price, and they facilitate those prices being artificially high and interdependent by eliminating ways in which there can be a complication, ways in which other participants can cheat on the interdependent pricing, and ways in which retailers can circumvent the interdependent pricing. And that goes even to the ones that were mentioned earlier as being somewhat less directly price-related, such as retailer-to-retailer sales and central warehousing. Those are both things that the record that was presented to the district court showed were ways to assure that the margin that the distributors wanted wasn't eroded by circumvention by the retailers. And that is part and parcel of the concerns that the Supreme Court had, this Court had, and the Fourth Circuit had. But what's complicated here is, as I understand it, the State could enact a statute that said every wholesale prices for liquor shall be X. Just set the prices. And then set a bunch of rules to enforce it, such as you can't have discounts and so on. And that would be a unilateral determination, and it would be outside the antitrust laws. Is that premise correct? Yes. That is what Midtel said as to retail prices. So the fact that the prices are higher and the people are making higher profits isn't the answer to anything, right? It has to somehow facilitate private steps in that direction, rather than imposing them by the State. Which is exactly what the Washington scheme does, as admitted by the defendants. The Washington scheme allows that private, interdependent, but noncollusive decision-making as they watch each other post prices, as they watch each other post off, as the hold keeps that target price in place, as it's easy to understand what your competitor did because there are no quantity discounts, there's only delivered pricing, there is no cheating by the competitor and no circumvention by the retailer, it allows that price to go up. The State is not fixing or setting the price. In fact, the chair of the Liquor Control Board specifically said that the State is not doing that. In fact, it's the State's philosophy, he claimed, that prices should be reasonable and that they were not trying to reduce consumption artificially by increasing prices. But in fact, all of these facilitating practices, each of which is per se when companies get together and say to themselves, we will exchange current prices, not just advanced look prices, but current prices, that's not only per se, it's criminal under our antitrust laws. And clearly, there is an inconsistency with Federal law, a preemption by Federal law, where the State authorizes parties and tells parties to engage in conduct that the Federal government thinks is criminal because it interferes with the law. So suppose in a situation, I mean, what's disturbing about this situation is it's hard to see any consumer-related interest. But suppose the State was to, and outside the liquor context, was to just pass a statute saying that, you know, when car dealers have to sell cars to the public to that same price they sell it to Hertz, just to take something off the charts and just make it up. And that's all they said. You know, whatever your price is to Hertz, charge it to everybody else. That has the same vice you're talking about, I guess. But the wisdom of all of these cases, from MidCal to 324 to Miller, is not just that the government could do it directly and it would have the same effect on consumers, but that if they don't do it directly, if they empower private parties to do it, then the Federal antitrust law --- Kagan. Is the example I just gave you directly or not directly? They're not setting the price, but they're setting a rule that you can't discriminate. It's not setting a rule that determines the price directly. It does not allow any discretion as to the price. I don't see the difference between that and the no-discounts rule here, for example. Well, Fisher and 324, interpreting Fisher, say that the difference is you were empowering the private parties to do it. You were not telling them exactly what it should be. No, you are. You're telling them to charge everybody the same price. If you look at that one only in isolation, it has that effect. It's the State and the defendants who tell us that you don't look at it only in isolation, that these are all interlocked. And what the evidence showed the district court and what showed this Court in Miller and TFWS, the Fourth Circuit and TFWS, as to delivered pricing and a ban on quantity discounts, exactly what you're talking about, is that those facilitate this interdependent pricing. It's the ultimate price setting that if you leave that to the private parties and then you make it as a rule. Well, they certainly facilitate it in the context of the price and hold. But do we have an obligation to look at the pieces separately and say, well, let's assume the price and hold is off the table. Why doesn't ordinary severability law apply at that point? First, that logic would apply specifically to delivered pricing and the quantity of discounts in Miller and TFWS. The rule of the antitrust laws is that you look at the whole package. And here, it was the defendants, again, who repeatedly told us, you need to look at the whole package. These are interlocking, testified-chairman laws. Kagan.                          There may be rules that facilitate collusion, but we're not going directly at collusion. We're dealing with the state rules. If I may beg to differ, I don't think that's the rule in antitrust, is that you're looking at all of the pieces of the conspiracy. You're looking at all of the effect on competition of the entire regime that has been established. And that's all we're asking here. Are both sides in agreement that we can't look at them item by item? We have to look at the totality? They were certainly in agreement at the district court, and sometimes in their briefs now, when it suits their purposes, that these have to be looked at together. Chairman Long testified to the district court repeatedly that they are interlocking. When we asked them in discovery, and we introduced this into the record, to defend each of these individually, they said, we can't do that. None of them by itself is necessary to satisfy state purposes. They need to be looked at as a whole. So that is their position that they have taken. Well, is that true for the price-related aspects, as well as, for example, central warehousing and so forth? Look at all of the entire package, or can you segment at least the price impacted or price-related? If you look at the history that we presented, for example, as to central warehousing, the history is that it was part of maintaining those same margins to avoid any erosion of the interdependent pricing that occurred, that distributors wanted to ensure central, that central warehousing was prohibited. So while it's not quite as directly price-related, it is still interrelated, it is still interlocked, and it still relates to the other part. Suppose we were to do that. Look at the current package, strike the whole package down just hypothetically, and, you know, the next day the legislature comes back and passes everything but the post and hold. So now we have a new case. And isn't that a very inefficient way to proceed? Well, it's the way our judicial system works. Your job is to decide the case that is here, and the legislature's job is to at some point finally try to do its best. But ultimately, I mean, when you began, and because I asked you to approach it this way, you began to try to explain why the other rules were themselves independently non-unilateral, yet when we started dividing it up, I mean, it appears that independently, for example, uniformity rule would be unilateral. Independently. And it is they who try to explain away TFWS on that very point by saying it's so interrelated that the Fourth Circuit had to strike it down with the post and hold. They aren't saying that. But you're not disputing my premise that at least some of these independently looked at would be unilateral. I wouldn't agree that they would be unilateral. I would agree that there is less direct participation by the private party in setting the price. But I do not agree that they are unilateral in the sense, for a couple of reasons, I don't think we need to go to each of them individually. In this case, you have a market participant, the Liquor Control Board, which is involved in this and is setting these licensing provisions and enforcing these license provisions. That was not true in Miller. It was not true, as I understand it, in TFWS. It's a very different situation, it seems. So that's fascinating, but it's never been mentioned before in this case that I know of that. Well, I think it was we did not have to go there, but we did mention it below. And certainly we can defend the result below on any ground that is in the record below. It's obviously clear that they are a market participant. And in fact, we had them testify at trial that where they both buy and sell wine, they don't follow these restraints in buying. They don't follow them in selling. And they have no difficulties in satisfying any State purposes. And that's the chart that we provided the Court, which kind of shows the basic structure currently of the Washington servicing consumers in various routes. The fact that you have two major routes that are now unrestrained, including the one operated by the State stores, in which they say there is no problem satisfying the State's interests under the 21st Amendment. If I could just mention one thing with respect to this question. This is an interesting question as to actual collusion and hybrid and the like. But I would remind you of what Judge Ludek said in concurring in the TFWS case, which is that you cannot get around the plain language and holding of 324 and of Miller and of the Supreme Court cases and of how they explained Fisher. He was candid enough to say perhaps the Supreme Court was wrong, but it's their job to correct that. That is the position the defendant should have taken. Kagan. And I share some of his concerns, which makes it very difficult to apply logic to a scheme, because it doesn't look like, since the scheme doesn't have any agreement requirement of any kind and its tone, it doesn't seem any different for most purposes than what every retailer does, which is set his own prices. I think it is still inconsistent with Federal antitrust law. And the reason is that there is more to Federal antitrust law than the element of combination or conspiracy. And combination itself can have a very broad meaning and understanding, as this Court and other courts have pointed out. But the Snake River case, for example, which the other side has mentioned, was a Section 2 case primarily. There was no requirement of a combination or conspiracy. And yet the preemption still was a possibility. If you look at the logic of cases like Copperweld, in which the Court explained that the even in the pure Section 1 area, the importance is having, the importance of decision-making as to these competitive elements. It is still very inconsistent, even for the State to ban in a unilateral sense, to limit that interdependent decision-making. And I think that the Court would find, and this is the gist of the Lopatka article that we cited to you, I think the Court would find, as squarely presented with this, is that where that price element is still not controlled, and where there is still private discretion in that price element and it is not actively supervised, if the State takes away independent competition of elements fundamental to getting to that price, then it is inconsistent. So you're essentially saying the State has to set the prices itself, period. It has to set the prices itself if it's going to, or it has to supervise what the private parties do if it leaves it to them after basically fixing it. Kagan. What would supervise mean other than set the prices itself? Pardon me? What would supervise mean other than set the prices itself? What Midcow said, that they look at the prices and make sure that they are reasonable. In this case, they would say to the State, you should not have this, you should make sure in operating this scheme that prices are not higher than they need to be  clear was not the goal of the State of Washington. They would have to look at that and make sure that it's not higher, that prices are not higher than necessary, and that prices are, in fact, satisfying some State goal. That's all that is required. This is not a heavy burden on State sovereignty. The federal courts, this court and the Supreme Court in these cases, are simply saying that if you are going to interfere with the nerve center of competition, independent decision-making as to these elements, then you need to substitute some enforcement to make sure prices do not get higher than they need to be. That's what's missing here. They've had four years to address that. They should have addressed that, and they should not be excused in terms of the State for not having done it yet. And, Mr. Berman, if we agree with everything you've said so far on the antitrust aspects of the case, then, of course, then we have to turn to the 21st Amendment. Yes. And that's something I have to tell you I'm not too familiar with. As far as I know, the law to me is not very clear as to what the burden is, what has to be shown. The district courts seem to hold the State to a pretty heavy burden. I would disagree that it was a very heavy burden at all, and I would also disagree that the burden question isn't clear. First, the State and the intervener agreed to take on the burden in the pretrial order, and they should not be allowed to challenge that now. And the State really hasn't. What do you mean by take on the burden? How? They said they had the burden of proof under the 21st Amendment. And the Supreme Court ---- To show what? To show what? That the way this scheme functioned achieved the purposes of the act, or what? I mean, burden to do what? Take on the burden to do what? I haven't seen any reason that the TFWS formulation is incorrect, which said the State has to come forth and show it's a deliberate State purpose. They have to come forth and show that they further that purpose in some way, and they have to come forth and show that the extent to which they further it outweighs Federal antitrust concerns. Now, there certainly was some expert testimony put on to demonstrate that there was some impact on Kemper and his concerns. And the judge, however, didn't believe it or didn't see it as adequate. And therefore, are we reviewing that determination for clear error? Is that what we're doing? No. It's, as this Court made clear in Miller and as TFWS made clear in accepting Miller on this, it is largely a factual determination. And the evidence ---- That's what I just said. So we then would be reviewing the district court for clear error. Oh, I'm sorry. Yes, on clear error. Yes. And in this case, remember the snippets that they pull out. They don't actually make the kind of showing this Court's procedures require to challenge factual findings. They pull out a few snippets and throw them around. What they don't tell you is the clear evidence in the record that temperance in the State of Washington does not mean artificially reducing consumption of wine and beer or artificially increasing prices. That was admitted by their historical expert. It is rife in their documents about how they operate the system. Secondly, their expert ---- What does it mean? It means essentially the ability to control sales to young people and so on. Right. It's at the point of sale. Their chair said temperance in the State of Washington doesn't mean artificially reducing consumption. It means at the point of sale worrying about sales to minors, sales to the integrated, sales to drivers. And the district court understood that. Secondly, their economics expert, Professor Chalupka, did not say that there was an effect on consumption. He said there could be. And that testimony, the Court heard the cross-examination. And he would just seem to me speaking just in general economic theory. It didn't tie to the evidence in this case. That testimony. I don't think the general economic theory is that any price increase in wine and beer is going to reduce consumption for a couple of reasons. He admitted that there wasn't high elasticity. They're largely inelastic. Moreover, he admitted that the money that would come in to the distributors, the excess money, could be and probably some of it would be spent on increasing promotion of alcohol. The Supreme Court in the BMI case said that one of the best ways to understand the effect of an anti-competitive scheme is what the private participants in it think it will accomplish. And the testimony that was before the district court was quite clear that the distributors thought that this would increase their margins, but it would not decrease their sales, that they would be better off financially, which is not what you would expect if there was that clear supply-demand, price-demand dimension. All right. So then the next purpose is orderly markets, and I have a hard time understanding why orderly markets doesn't collapse into anti-competitive markets and violations of the antitrust laws. What does orderly markets mean in this context? Well, the state didn't know that. In fact, they basically said that in response to discovery, and again, this is in the between orderly markets and normal competition. So they – I believe that they basically – and I think they convinced Judge Peckman that orderliness did not have any meaning that would be important here. And on the burden of proof, let me just mention a couple of cases that I would draw your attention to. One of them is 44 Liquor Mart, which says that Midcal stands for the proposition, quote, that the 21st Amendment does not in any way diminish the force of the supremacy clause as carried out by the Sherman Act. Going way back to North Dakota, and I again apologize for mis-citing it in our opening brief, but for them to rely upon that old case which has no direct statement as to – of any daring on this case and to ignore Granholm and 44 Liquor Mart is simply inexplicable. What does Granholm say, in your view? Granholm clearly says the burden is on them, and it addresses this question of how heavy the burden is. There were – it was on summary judgment. There were declarations from State officials that assumed and said that this was important to controlling possible problems, possible temperance-related issues in Michigan. And the Court said that's not enough. There's – there's not sufficiently substantiated under Midcal in 324. The State of Washington — What's that limited to the interstate discrimination, in effect? Well, the – I think the understanding of how you look at evidence isn't limited in that way. But remember that the interstate discrimination is just part of the Commerce Clause. And what the Supreme Court said in Midcal and 44 Liquor Mart is that the antitrust laws, the Sherman Act is a way that Congress has fully carried out the Commerce Clause. So you really can't separate those, and that's why 44 Liquor Mart said the 21st Amendment is not a limitation on the antitrust analysis. The – if you go back to Midcal in 324 … But – but there are limits to that analysis, are there not? There are certainly anti-competitive, per se, violations of the Sherman Act that are protected by the 21st Amendment, are there not? None have been found by the courts so far that I'm aware of. In every case, and that's a problem that they have, where there has been a clear Sherman Act violation under the initial analysis, it has not satisfied the 21st Amendment. Kagan. You're essentially saying that the other filters, that is, the preemption filter and the Parker v. Brown filter, are going to filter out any regulations in which the State interest is sufficiently strong and the regulation is sufficiently concrete to really deal with First Amendment – 21st Amendment, and you're – there's going to be a – the trickle at the other end is going to have very little in it. Exactly. Parker v. Brown is a way of protecting State sovereignty where the State shows that because it clearly articulated a deliberate purpose and because it actively supervised the trenching on Federal interests in terms of the Sherman Act, that the Court would respect that interest. The 21st Amendment is just another type of State interest. Could you just, because it would make me understand all this better, try to explain to me how you think the preemption piece and the Parker v. Brown piece fit together? I agree with you. I think they do also collapse, or at least they're the flip side of each other. If a group of restraints or a restraint is hybrid, that means that there is a private element in that ultimate price that affects the consumer, which is what we're concerned with under the antitrust laws. And therefore, once you conclude that there is that private element, then you have to have active supervision. So if there is a private element, you have to have active supervision. If there's active supervision, the private element is taken care of by the active supervision. It seems to me they are very closely related. Counsel, I don't recall that you addressed the central warehousing issue. Central warehousing and also the issue that we lost on the retailer-to-retailer sales are two that the district court specifically looked at. And I think because of that, it's very unfair for the defendants to suggest that the district court did not look at each of these restraints. Our evidence as to the anti-competitive effects from Professor Loeffler addressed each of them separately. The district court looked at these two. These happen to be the two that they focused on the most. But I think that's because they basically concede that everything else is unconstitutional. As to these two, they are not quite as directly related to price. But they are part of this overall integrated interlocking regime, the purpose of which is to get at a price that goes from the distributor to the retailer. And I see no reason functionally or logically why state initiatives that cut off circumvention of interdependent pricing should be analyzed any differently than state initiatives that facilitate interdependent pricing. They ought to be looked at similarly. This is not an area where the law is as clear as in everything else in this case. But it seems to me the logic is the same and that they have given you no reason to think that the logic should be any different. Both of those two restraints would be, per se, violations looked at in isolation. But both of them would be unilateral if looked at in isolation. You certainly could argue that they would be unilateral if the State wasn't also a competitor, for example, in retailer-to-retailer sales. They are the only retailer that can sell to another retailer. And the testimony at trial showed, well, they didn't think there was any problem with that. It didn't affect any 21st Amendment interests. There wasn't anything special they did to track those sales from them as retailer to some other retailer. They are a market participant and they are the ones who are imposing this on other market participants. And that seems very clearly to be a combination in violation of the antitrust laws. But even if the edict, you will not have a central warehouse, sounds more unilateral in this context, where it is a way to enforce, which is what they said, both in the evidence and their arguments to the lower court, ways to enforce the other parts of the regime, then it should be dealt with the same way. And the severability clauses and the desire of the court, understandably, not to strike down more than it needs to, which Judge Peckman obviously felt as strongly as this court feels, simply shouldn't enter into this. We're not asking you to strike down the entire state regulatory system. We're not even asking you to strike down entire sections or subsections. We're simply asking you to enforce the lower court's injunction against carrying those out in these specific ways, each of which has an anti-competitive effect, each of which was argued by them to be interlocked with each other, and each of which could not be justified by them when they had the opportunity to do it at trial, both as to Parker and as to the 21st. Kennedy. Verrilli, before I sit down, speaking of the lower court's injunction, you know, we have the State's motion to extend the stay pending appeal. Would you just tell me briefly what your position on that motion is? Well, most of the reasons that they gave to the district court and to this Court in their initial motion have gone by at this point. So as I understand it, basically what they're saying to you is they decided to stop the Study Commission, the Liquor Control Board, not to make any recommendations after it was done and to try to keep things bottled up. But the fact is we all have to try to obey the law. They're not entitled to a stay saying you don't have to worry about obeying the law in the future. That's really all they're saying at this point, is that we have violated the law. We have violated the law for years. The district court found that we have violated the law. This Court in Snake River suggested that the distributors would be liable for damages if, in fact, they did not have a good faith justification in terms of complying with State law. At this point, time has run out. They should be told to obey the district court injunction. If this Court should reverse at some later date, no harm will have happened. The restraints can go back into effect. There is not going to be anything terrible that's going to happen. In the meantime, they didn't prove that to the district court. They haven't proven it in their declarations or affidavits to this Court. Roberts. Thank you, counsel. Your time has expired. We will hear from Mr. Gordo. Well, you have about three and a quarter minutes. First, what you didn't hear from Mr. Berman is any explanation as to why these restraints, considered independently, are not unilateral. They are unilateral. Well, we've heard some. Well, but they all tie back to this idea of interdependent pricing. Interdependent pricing means you make a pricing decision based on all the knowledge and information you have about everybody else's prices. If all Mr. Berman is talking about is the anti-competitive effect, his analysis would invalidate every minimum wage law, would invalidate every usury law, because there is an element of competition that has been eliminated, but private parties set their prices. If you take away the price posting and the hold under Miller, and, again, I'm not sure you need to, but if you do, severability principles require that you look at all the others independently, and they are clearly unilateral. I would turn very briefly to the 21st Amendment issues. I think there are three, right? Mr. Berman doesn't think the 21st Amendment means anything anymore, apparently. You know, I don't believe you get to the 21st Amendment in this case, but under – because I don't think you need to, but under Mr. Berman's analysis, you know. Well, for the sake of argument, assuming we get to the 21st Amendment issue. Right. But what does this orderly markets mean? It seems to be a tautology, practically. An orderly market is the market that we want to have, and the market we want to have is an anti-competitive market. So how can you make any – how can we as judges make any judgments about what's an orderly market? I think you can look at the Washington statute, which was adopted in 1995, at which time the State legislature codified what had long been a legislative – or a regulatory regime, put it into statute. They adopted a – an intent provision that said it was the intent of the statute to foster orderly marketing. I don't remember exactly what it was. I understand, but what is an orderly market? And then – and then in that same bill, they adopted a provision that required prices posted in hell. Yeah. So it's a tautology. So you're only proving up what I just said. The orderly market is the kind of market we want to have. Exactly. An orderly market is a controlled market. An orderly market is a controlled market. And it's the State's prerogative under the 21st Amendment to decide how that market should be structured. So you're basically saying that there's no – I mean, so it comes down to sort of the opposite. One side is saying 21st Amendment means nothing, and the other is saying it means everything. You're saying any market we want to have is a market we're allowed to have under the 21st Amendment. I don't think I would go quite that far. There may be circumstances where that would not suffice. But I will say the other fundamental error, I think, is the trial court said that the decision was weighing the State's interest in the 21st Amendment against a national policy of free competition. There never is – never has been such a policy with respect to alcohol. Starting with the Wilson Act, adopted the same year as the Sherman Act. Through the Webb-Kenyon Act, through the 18th Amendment, through the 21st Amendment, through the Federal Alcohol Administration Act, through the STOP Act, it was just signed last fall. All of those bills represent an intent by Congress to have alcohol regulated. What are you arguing? That we should give very broad discretion to the State's interpretation of its own goals with respect to the 21st Amendment? Absolutely, Your Honor. They're not pretextual. There's a significant balance. And the impact on competition in this case is relatively nominal. Compared to the pernicious behavior found in, for example, 324 Liquor and Midcow, where there's actual resale price maintenance, actual private parties dictating prices from one to the other. Ms. Lance wanted a moment. I don't know if I left her any time or not. He was very magnanimous. He gave you 18 seconds. Please, please, go. We'll leave her. I'd just like to make two points, nine seconds each. First, in response to Casca's position on the stay, the stay is still necessary. None of the reasons that were advanced in the briefing have gone away. The decision of the legislature and the Liquor Control Board in determining what they can and can't do with the district court's decision has nothing to do with the need for a stay from this court. Second, I just wanted to touch on the standard of review question that was asked by this Court. The State disagrees with Casca's analysis. As we pointed out in our briefing under the 21st Amendment analysis, this Court's standard of review is a de novo application of constitutional law to the facts that were found in it. Yes, but as to facts, it has to be clear error. The fact, as to the question of whether in fact, for example, the regulations have had any effect on consumption, we have to review for clear error. What else can we review for? As to whether the regulations have had effect on consumption or on orderly marketing or on tax collection, any of the core concerns, this Court's analysis is to determine whether the evidence found in the form of facts, as some were, and in the form of opinions and reasoning and analysis, as much of it was, whether that is sufficient to be considered as a de novo basis. On a de novo basis. But we never do that. Why would we be doing it here? When you're applying constitutional law, as you are here, to resolve the tension between two competing constitutional provisions, the Sherman Act and the Commerce Clause and the 21st Amendment, this Court has held in a number of cases, which we've cited in our brief, that your job is to apply constitutional law to the facts as found. The facts as found. So as to the facts as found, we review them for clear error. Right. And as we point out in our briefs, it's the Court actually did find facts, but it would allow you to apply the constitutional law to give meaning to the 21st Amendment. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Tashima, Berzon